**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

**Filed / Docketed**
**July 9, 2007**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **BREEDLOVE, STEPHEN J.,** | )   **Case No. 04-11096-R** |
| | )   **Chapter 7** |
| Debtor. | ) |

| | |
|---|---|
| **COMMERCIAL BANK,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   **Adv. No. 04-1116-R** |
| | ) |
| **STEPHEN J. BREEDLOVE,** | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This matter came on for trial on the merits on April 9 and 10, 2007, on Commercial Bank's Amended Complaint to Determine Non-Dischargeability of a Debt (Doc. 50), filed by Plaintiff Commercial Bank (the "Bank") against Defendant/Debtor Stephen J. Breedlove ("Breedlove").  In its Complaint, the Bank claims that Breedlove owes the Bank a debt in excess of one million dollars, and that the debt is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4) and (a)(6).  The Bank appeared through its Vice President, Ray Feess, and its counsel, David Wheeler and Robert Butler, and Breedlove appeared in person and through his counsel, Paul Tom.  Prior to the commencement of the trial, the Bank withdrew its claim under 11 U.S.C. § 523(a)(4).

Upon consideration of the pleadings, including stipulations contained in the Pretrial Order, the testimony and documentary evidence admitted at trial, the arguments of counsel[1] and applicable law, the Court finds and concludes as follows:

## I.      Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(I); and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.     Contentions of the parties

The Bank contends that Breedlove "obtained money, property, services or an extension, renewal or refinancing of credit" by employing "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition," and that any benefits so obtained by Breedlove constitute a non-dischargeable debt to the Bank.  11 U.S.C. § 523(a)(2)(A).  Generally, the Bank alleges that Breedlove requested the Bank to renew a promissory note and line of credit in favor of Breedlove Automotive Group, Inc. ("Breedlove Automotive") (an automobile dealership wholly owned by Breedlove)**,** when Breedlove knew that Breedlove Automotive was unable

---

[1]On March 10, 2007, Breedlove filed Defendant Breedlove's Motion for Summary Judgment and Brief in Support thereof (Doc. 63, 64); on March 26, 2007, the Bank filed its Brief in Response to Defendant's Motion for Summary Judgment (Doc. 80); and on April 2, 2007, Breedlove filed Defendant Breedlove's Reply Brief in Support of his Motion for Summary Judgment (Doc. 90).  Finding that genuine issues of material fact precluded the entry of summary judgment, the Court denied Breedlove's motion, but advised the parties that the Court would take into consideration the legal arguments and authorities cited in the briefs in issuing a decision at the conclusion of the trial.

to repay the debt and/or that at the time of the renewal, Breedlove Automotive, acting through Breedlove, did not intend to repay the Bank.

The Bank also alleges that contrary to the terms of a Floor Plan Agreement between the Bank and Breedlove Automotive, pursuant to which the Bank advanced funds to Breedlove Automotive to purchase specific vehicles as inventory, Breedlove sold floor-planned vehicles "out of trust," that is, he sold approximately twenty (20) automobiles without remitting the agreed portion of the proceeds (*i.e.*, the amount loaned to Breedlove to acquire the vehicle) to the Bank to reduce the indebtedness for which the vehicles served as security.  The Bank further alleges that Breedlove used the proceeds of the Bank's collateral to enrich himself personally at the expense of the Bank.  The Bank contends that by selling the cars "out of trust," Breedlove converted the Bank's collateral, which the Bank argues constituted a "willful and malicious injury by the debtor to another entity or to the property of another entity," and thus any damages incurred by the Bank as a result of such conversion are non-dischargeable.  11 U.S.C. § 523(a)(6).

In defense of the Section 523(a)(2)(A) claim, Breedlove contends that he did not make any false representation to the Bank regarding Breedlove Automotive's ability to repay the Bank and that because the Bank had knowledge of Breedlove Automotive's precarious financial position, the Bank could not have justifiably relied on any such representation.  Further, Breedlove argues that to the extent the Bank contends that Breedlove orally or by implication made a representation of financial ability to pay the Bank, such a non-written representation does not bar a resulting debt from discharge.  Finally, to the extent the Bank

3

contends that Breedlove misrepresented his intent to repay the Bank, his efforts to repay the Bank negate the implication of a lack of intent to repay.

In defense of the Section 523(a)(6) claim, Breedlove argues that the Floor Plan Agreement[2] was not an enforceable contract,[3] and that if it was an enforceable contract, that the Bank waived various terms of the Floor Plan Agreement, or is estopped from enforcing them, including the requirement that Breedlove Automotive remit the proceeds of the sale of a floor-planned vehicle within three days of the sale, by the parties' course of dealing and performance of the agreement, and that Breedlove's reliance on the established course of performance negates any intent to harm the Bank.  Breedlove also contends that the Bank failed to properly apply payments made to the Bank by Breedlove Automotive against the advances for the "out of trust" vehicles.

Breedlove also argues that in the event that any debt is determined to be non-dischargeable, the amount of the debt should be reduced because the Bank (1) repossessed

---

[2]Prior to trial, Breedlove moved to exclude as evidence herein the Floor Plan Agreement dated February 9, 2001, claiming that the agreement had been superseded by subsequent agreements between the Bank and Breedlove Automotive, and that because certain terms of the Floor Plan Agreement contradicted terms of the subsequent agreements, the Floor Plan Agreement constituted inadmissible parol evidence.  See Defendant Breedlove's Motion in Limine Based on the Parol Evidence Rule and the Doctrine of Incorporation by Reference and Brief in Support of Motion (Doc. 65).  By virtue of a bench ruling issued immediately prior to trial on April 9, 2007, the Court overruled the motion in limine, concluding that the Floor Plan Agreement incorporated by reference current and future notes and security agreements, and that the subsequent notes and security agreements incorporated by reference or otherwise preserved the terms of the Floor Plan Agreement.

[3]Breedlove's challenge to the formation of the contract includes arguments that there was not a meeting of the minds, that the agreement was not complete or final, and that the agreement was never delivered.

inventory when Breedlove Automotive was not in default; (2) did not sell the repossessed inventory in a commercially reasonable manner; (3) did not properly apply the proceeds of the inventory against the debt; (4) did not mitigate its damages by auto-debiting Breedlove Automotive's operating account; and (5) did not mitigate its damages to the extent that the Bank loaned funds to purchasers of several of the "out of trust" vehicles, and deposited the loan proceeds into Breedlove Automotive's operating account rather than applying the proceeds to reduce Breedlove Automotive's debt related to the vehicles.

## III.    Evidentiary issues

### A.    Defendant's Motion in Limine

Prior to trial, Breedlove filed Defendant's Breedlove's Motion in Limine Based on Spoliation of Evidence, Estoppel and Negative Inference (Doc. 67) ("Motion in Limine"). Breedlove alleged that the Bank had discarded, destroyed or failed to preserve check stubs[4] that were attached to checks written and delivered by Breedlove Automotive to the Bank during August and September 2002, the relevant time period.  Breedlove alleged these check stubs would establish that he had indeed remitted the proceeds of the sales of cars the Bank alleges were sold "out of trust."  As a sanction for the alleged spoliation of relevant evidence, Breedlove requested that the Court "employ the negative presumption that all payments made by Breedlove Automotive shall be applied to the 'out of trust' vehicles" or, in the alternative, require the Bank to retroactively apply all payments made by Breedlove Automotive to the

---

[4]Breedlove's Exhibit 14 contains check stubs, some of which are labeled "remittance advice[s]," dated July and August 2002, which identify the floor-planned vehicle to which the payment was to be applied.  There was no testimony regarding whether this exhibit included all the stubs retained by the Bank for that period.

"out of trust" vehicles before applying such payments to other indebtedness.  Motion in Limine at 5-6.

In Plaintiff's Response to Defendant's Motion in Limine Dated March 15, 2007 (Doc. 89), the Bank denied that it intentionally disposed of check stubs instructing the application of funds to a particular vehicle for the purpose of obstructing discovery, and argues that it never possessed certain "missing" check stubs because it never received the checks.  Because the motion generated disputed issues of fact, the parties were instructed to present evidence on the issue during the trial, after which the Court would consider whether spoliation occurred and if so, what sanction was appropriate.

Breedlove, as the movant, had the burden of establishing spoliation by a preponderance of evidence.  United States v. Krause (In re Krause), No. 05-5775, 2007 WL 1597937 (Bankr. D. Kan. June 4, 2007), at *18.  "[T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction."  Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997).  "The adverse inference must be predicated on the bad faith of the party destroying the records."  Id.  "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case."  Id.[5]  Moreover, unless a duty otherwise exists,

_____

[5]The Tenth Circuit has held that "[c]ourts have not generally imposed a similar requirement of bad faith when considering other sanctions for the spoliation of evidence." 103 Investors I, LP v. Square D Co., 470 F.3d 985, 989 (10th Cir. 2006).  In that case, the circuit affirmed the trial court's decision to strike the testimony of a plaintiff's witness whose memory could not be tested due to the destruction of physical evidence by the plaintiff.  Id.

a party has no duty to preserve evidence unless and until "he knows or should know [that the evidence] is relevant to imminent or ongoing litigation." Krause, 2007 WL 1597937 at *18. "A party can only be sanctioned for destroying evidence that it had a duty to preserve." Id.

At trial, Breedlove tendered bank statements and a summary exhibit as evidence that during the month of August 2002, Breedlove Automotive wrote and the Bank processed forty-six checks payable to the Bank in the total amount of $426,620.80. Breedlove Exhibits 11, 12. Breedlove contends that attached to each check was a stub which contained instructions for application of the payment, *i.e.*, that the payment was intended to pay off a particular floor-planned vehicle, or was an interest payment or a reduction of principal. Breedlove failed to present any evidence that the Bank disposed of the stubs at a time when the Bank had notice that the stubs would be relevant evidence in litigation. The Bank's president testified that because of the volume of business it does each day, it did not normally retain Breedlove Automotive's check stubs because it assumed that if there was a dispute about the application of funds, Breedlove Automotive would have a copy of the stub as proof of payment. Transcript of Deposition of Philip Eaton, Breedlove Exhibit 8, at 11-12, 16, 14-45. The Court cannot infer that the Bank sought to destroy relevant evidence if, in August 2002, it disposed of check stubs because at that point, proper application of payments had not been at issue. Id. at 15. In addition, as of August 2002, Breedlove Automotive was not in default on its loans. Id. at 90.

The absence of a check stub in the Bank's records relating to a particular vehicle sold by Breedlove Automotive could mean that the Bank lost or disposed of the stub, but it could

just as easily mean that the Bank never received payment from the proceeds of the sale of a vehicle.  Breedlove failed to present any evidence that the Bank actually received payment for any particular vehicle for which the Bank did not produce a stub,[6] nor did he present any evidence that the Bank disposed of or destroyed any particular stub relating to the payment of proceeds of a floor-planned vehicle.  Further, Breedlove did not present any evidence that the Bank accepted a payment of collateral proceeds without properly crediting the payment against the loan made to acquire the vehicle.[7]  In fact, testimony of Barbara Thompson, a former employee of Breedlove Automotive, established that she was aware that with respect to certain vehicles, the sales proceeds were not remitted to the Bank, and she had advised Breedlove of that fact.[8]  Breedlove did not testify at trial,[9] and therefore Ms. Thompson's testimony was uncontroverted.

---

[6]Breedlove's counsel argued that Breedlove's own books and records were kept electronically and the computers on which the records were kept "were gone" and therefore Breedlove had no ability to retrieve or print Breedlove Automotive's checking account records that would have confirmed the notation on the check stubs.

[7]During the relevant time period, the Bank retained the titles to the floor-planned vehicles and released a title to Breedlove Automotive, or to the purchaser, after Breedlove Automotive tendered the amount advanced to Breedlove Automotive in exchange for a security interest in the vehicle.

[8]See also Transcript of Deposition Testimony of Barbara Thompson, Bank Exhibit 115, at 40-41.

[9]The transcript of Breedlove's deposition was admitted as the Bank's Exhibit 114. With respect to inquiries about whether proceeds of certain vehicles were remitted to the Bank, Mr. Breedlove asserted the right to refuse to answer under the Fifth Amendment of the United States Constitution.  On August 4, 2004, Breedlove was charged by the State of Kansas with seventeen counts of "failing to account to secured party," which proceeding was pending as of the date of the deposition and as of the date of the trial.  Exhibit D to Breedlove Transcript, Bank Exhibit 114.

Thus, in absence of evidence that the stubs Breedlove contends were destroyed even existed, Breedlove failed to establish spoliation of evidence. Further, the fact that the Bank did not retain stubs indicating the intended application of a payment does not reflect a consciousness that its non-production would somehow benefit the Bank in future litigation, and therefore the Bank did not act in bad faith if it disposed of those stubs.[10]

Thus, the Court denies Breedlove's Motion in Limine.

B.     Defendant's objection to testimony of the Bank's purported expert

The Bank presented Eva Jo Sparks as its expert in the "field of fraud examination" and sought to admit opinions set forth in her Expert Report (Bank Exhibit 116). Breedlove contends that Ms. Sparks is not qualified to render an expert opinion on the propriety of Breedlove's financial transactions because she has no experience in managing or auditing an automobile dealership. The Court took Breedlove's objection under advisement.

Rule 702 of the Federal Rules of Evidence states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of

---

[10]Breedlove also argued that the Bank had an obligation to keep copies of every check stub pursuant to Kansas law, but did not cite any authority for that proposition.

Further, Breedlove argued that the Bank is estopped from asserting that Breedlove sold cars "out of trust," because the Bank could have applied other payments to retire the loans of the "out of trust" vehicles, and that the Bank manipulated the application of payments to manufacture a violation by Breedlove of the Floor Plan Agreement. For this proposition, Breedlove cited Spectrum Paint Co. v. Chambers (In re Chambers), 226 B.R. 915 (Bankr. N.D. Okla. 1998). However, Breedlove failed to establish that the Bank applied any payment contrary to instructions by Breedlove.

reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Ms. Sparks has been a certified fraud examiner since December 1999, and is self-employed. Prior to becoming a certified fraud examiner, she was employed by the Oklahoma State Auditor's office, where she audited county governments and state agencies. She is a member of National Association of Certified Fraud Examiners ("NACFE") and is president of OKC Chapter of Certified Fraud Examiners. When she became certified, NACFE required an applicant to have a four year college education or two years of work experience in a financial, auditing or banking field, and to pass a four-part examination. During the five years she was employed with the State Auditor's Office, she had oversight over other auditors and wrote or prepared audit procedures for investigative audits. She was qualified as an expert in various courts and agencies in Oklahoma, Arizona, Pennsylvania, Texas, Ohio, Illinois, and New Mexico. Ms. Sparks has never worked at or audited an automobile dealership, and has no experience in evaluating the propriety of particular expenses of an automobile dealership. However, Ms. Sparks has "knowledge, skill, experience, training, or education" in the field of fraud examination, and therefore may testify thereto in the form of an opinion regarding the results of her analysis of Breedlove's financial transactions *if* the Court finds that she based her opinions on sufficient facts and data, used reliable principles and methods in arriving at her opinions, and applied the principles and methods reliably to the facts and data in this case. See Fed. R. Evid. 702.

As explained in the Expert Report, Ms. Sparks' methodology consisted of reviewing Breedlove Automotive's bank statements for 2000-02 and extensively analyzing Breedlove's financial data for the year 2002 (and part of 2003) and that of persons and entities affiliated with Breedlove, *i.e.*, Breedlove Automotive, Breedlove Nissan, Breedlove Management, Inc. ("Breedlove Management") and Breedlove's wife, Donna Breedlove.  These documents included check images, deposit details, credit card statements, loan documentation and histories, and real estate closing and settlement statements.  Ms. Sparks also reviewed Breedlove's bankruptcy schedules and the Bank's Complaint to Determine Non-Dischargeability of Debt.  Ms. Sparks did not interview anyone familiar with Breedlove Automotive's books and records to determine the nature (personal or business) of the transactions she analyzed, but relied solely on the Bank's allegations contained in its Complaint for context.  Expert Report at 6-7.[11]  Nor was Ms. Sparks provided, and she did not review, the transcripts of the Rule 2004 examinations of Breedlove and Donna Breedlove.

Based upon her review and analysis, Ms. Sparks derived the following opinions:

1.     Breedlove, as President of Breedlove [Automotive], breached his signed agreements with [the Bank].

2.     Breedlove, as President of Breedlove [Automotive], wilfully and knowingly misappropriated funds that should have been paid to [the Bank].

---

[11]Ms. Sparks did inquire of certain payees as to the nature of certain payments; *i.e.*, she testified that she spoke to a representative of U.S. Bank to determine that recurring payments to U.S. Bank of $2,790 were payments on a loan secured by a boat.  She also spoke to a representative of LaBette County Bank regarding a loan secured by a Harley Davidson motorcycle and a Nissan.

3.  Breedlove, as President of Breedlove [Automotive], knowingly embezzled funds by diverting Breedlove [Automotive]'s operating revenues to other Breedlove accounts, which paid for the Breedlove's [sic] lavish lifestyle pleasures.

4.  "Out-of-Trust" is a term of art.  Trust is defined as a right of property, real or personal, held by one party for the benefit of another.  Any arrangement whereby property is transferred with intention that it be administered by a trustee for another's benefit. [sic] Commercial Bank provided principal loan advances for the enrichment of Breedlove, Breedlove [Automotive] and Commercial Bank.  Breedlove breached that trust by selling Commercial Bank collateralized vehicles and retaining those monies for his personal and financial gain.

Expert Report at 12-13.

Upon consideration of Ms. Sparks' testimony and the Expert Report, the Court finds and concludes that Ms. Sparks' opinions do not assist the Court in understanding the evidence or in determining a disputed issue of fact and that her opinions are based upon faulty factual and legal premises, and therefore are not admissible.  Ms. Sparks' first opinion–that Breedlove as president of Breedlove Automotive, breached his agreements with the Bank–is not relevant to the Bank's claims that Breedlove's debt to the Bank is non-dischargeable.  Generally, debts arising from simple breaches of contract are dischargeable.  Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1205 (9th Cir. 2001) (unless a debtor's breach of contract is accompanied by malicious and wilful tortious conduct, it is dischargeable).

Ms. Sparks' second opinion–that Breedlove wilfully and knowingly misappropriated funds that should have been paid to the Bank–is beyond Ms. Sparks' qualifications as an expert.  In simply reviewing financial records, Ms. Sparks could not have gathered sufficient

facts to determine Breedlove's state of mind.  Further, to the extent Ms. Sparks contends that Breedlove applied funds that should have been paid to the Bank to his personal use, the documentation she reviewed was not sufficient to support any assumptions regarding which payments by Breedlove Automotive were for personal expenses and which were for *bona fide* business expenses.

Ms. Sparks' third and fourth opinions–that Breedlove embezzled the Bank's funds or breached duties arising out of a trust relationship–are not relevant to this proceeding, because the Bank has withdrawn its claim under Section 523(a)(4).  Further, to the extent that Ms. Sparks purports to render legal conclusions as to what constitutes fraud, embezzlement, and breach of fiduciary duty, the Court is well equipped to discern the legal principles relevant to this proceeding. See Specht v. Jensen, 853 F.2d 805, 807 (10th Cir. 1988)("A witness cannot be allowed to give an opinion on a question of law . . . There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge.")(quotation and citation omitted).  Further, the Court does not require expert assistance in applying the law to the facts, and thus Ms. Sparks' opinions do not assist the Court.

Finally, Ms. Sparks' conclusions were too often based upon mistakes of fact, unsupported assumptions, or a faulty understanding of legal principles.  Ms. Sparks assumed that certain checks written from Breedlove Automotive's operating account were used to pay Breedlove's personal expenses, but her assumptions were often based upon speculation without any evidentiary foundation.  For example, Ms. Sparks concluded that payments

Breedlove Automotive made to Breedlove Nissan were "non-business" expenses, but at trial, a former employee of both Breedlove Automotive and Breedlove Nissan testified that Breedlove Automotive purchased vehicles from Breedlove Nissan to resell to Breedlove Automotive customers and vice versa, which would explain why Breedlove Automotive transferred funds to Breedlove Nissan. The former employee also testified that funds were transferred between the two entities as funds were needed to pay payroll and other business expenses. While Breedlove Automotive transferred funds to Breedlove Nissan, Breedlove Nissan also made substantial payments to Breedlove Automotive each month, many times exceeding the amount Breedlove Automotive paid to Breedlove Nissan.[12] Further, Breedlove Nissan also made payments to the Bank on behalf of Breedlove Automotive.[13] Accordingly, the evidence does not support Ms. Sparks' assumption that transfers to Breedlove Nissan were non-business expenses or that transfers of funds from Breedlove Automotive to Breedlove Nissan harmed the Bank.

Ms. Sparks also concluded that travel expenses were personal in nature, when it was possible that Breedlove traveled for business purposes. She concluded that payments to Breedlove Management were "non-business" expenses, notwithstanding that Breedlove Management appeared to charge both Breedlove Automotive and Breedlove Nissan a fee to manage the dealerships. Breedlove Managment was essentially the conduit through which

---

[12]From January 2002 to August 2002, Breedlove Automotive paid Breedlove Nissan $345,156.64 and Breedlove Nissan paid Breedlove Automotive $372,973.10, resulting in a net gain to Breedlove Automotive of $27,816.46. Expert Report, Tab 5A at 3-4, and Tab 6.

[13]From January 2002 to August 2002, Breedlove Nissan paid the Bank $129,648.75. Expert Report, Tab 6.

Breedlove was paid for his services.  Other expenses that Ms. Sparks deemed "non-business" included expenses paid to LaBette County State Bank, which held the mortgage on the building from which Breedlove Automotive operated, expenses paid to insurance companies, service contract providers, hardware stores, car audio companies, medical providers, construction companies, a marketing company, a web designer, and other expenses that could have been related to maintaining a car dealership.[14]   Unless Ms. Sparks was provided with an invoice regarding the purpose of an expense, she assumed that it was not a legitimate business expense.  There is no evidence that she requested invoices from Breedlove or any entity that may have possessed invoices, or that she interviewed either of the Breedloves regarding the purpose of each expense.

Ms. Sparks concluded that the Breedloves purchased a home in Bixby, Oklahoma, using more than $100,000 of Breedlove Automotive's funds, which the Bank contends should have been paid to the Bank.  However, Ms. Sparks' attempt to trace funds from advances by the Bank into the account of Breedlove Automotive, which transferred funds to Breedlove Nissan, which transferred funds to Breedlove Management, which transferred

---

[14]Breedlove Automotive sometimes paid the credit card statements containing non-business charges.  The credit card statements included some charges by entities such as Collector's Universe and Cameo CC LLC.  Ms. Sparks used the internet to find websites for businesses with such names, and from the content of those websites, she assumed that these charges were for the purchase of coins.  She also noted from memos on deposit details that Breedlove sold coins on e-bay and deposited proceeds into his personal account.  She noted that $49,000 was deposited into Donna Breedlove's account by virtue of two cashier's checks remitted by Tulsa Gold and Silver.  From this information, she deduced that Breedlove had sold gold and silver purchased and owned by Breedlove Automotive.  However, Ms. Sparks had no actual knowledge of what goods or services were purchased by virtue of the charges reflected on the credit cards or what was later sold on e-bay or to Tulsa Gold and Silver.

funds to Donna Breedlove's account, which eventually paid earnest money of $20,000 to Delta Title for the purchase of the Bixby home, falters due to the passage of approximately two and one-half months, and a turn over of funds in and out of the accounts, between the time the Bank advanced funds to Breedlove Automotive and the time Donna Breedlove wrote the check to Delta Title.[15]  Ms. Sparks concluded that the Bank paid approximately thirty percent of the purchase price of the Bixby home, but the documentary evidence does not support that conclusion.

Ms. Sparks also erroneously concluded that "Commercial Bank and Breedlove enjoyed a fiduciary relationship and [that] Commercial Bank trusted Breedlove to honor his financial obligations."  Expert Report at 4.  Generally, the relationship between a financial institution and its customer is one of a creditor and a debtor, and a customer is not a fiduciary of a bank.  Moreover, for the purpose of determining whether a debt is non-dischargeable, a debtor who violates the terms of a floor plan agreement by selling vehicles without remitting their proceeds to the lender has not breached a fiduciary duty.  See Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934). While Ms. Sparks has a general understanding of concepts of fraud, embezzlement, theft, and breach of fiduciary duty, in the bankruptcy context, and specifically in non-dischargeability proceedings, those terms are subject to subtle legal refinements on which Ms. Sparks, who is not a lawyer, is not qualified to opine.

---

[15]Using a "First-In-First-Out" accounting method, the Bank's funds, deposited into a Breedlove Automotive account in mid-August 2002, were spent long before Breedlove Automotive transferred funds to Breedlove Nissan at the end of August 2002.

Thus, Ms. Sparks' ultimate conclusions are not admissible under Rule 702 of the Federal Rules of Evidence.

However, to the extent that Ms. Sparks has used her skill and experience to assemble and review financial documents and organize the transactions reflected by the documents on spreadsheets, the Court finds those portions of her Expert Report helpful and therefore admissible. Thus, the Expert Report, Bank Exhibit 116, is admitted as a summary of the financial documents reviewed by Ms. Sparks and is admitted for the limited purpose of showing that transactions listed on the summaries occurred. The factual and legal conclusions Ms. Sparks has drawn from the raw data, particularly those based upon unsupported assumptions as to the nature of payments made by Breedlove Automotive, are unreliable and therefore inadmissible.

Accordingly, Breedlove's objection is sustained in part and overruled in part.

C.     Objection to admission of Willis Transcript

At trial, the Bank sought to introduce into evidence the transcript of a deposition taken of Steven Willis (the "Willis Transcript"). Proffered Exhibit 142. Breedlove objected to the admission of the Willis Transcript as hearsay. Further, Breedlove contends that his counsel did not have an adequate opportunity to cross-examine Mr. Willis at the deposition because Mr. Willis abruptly left the deposition before counsel had concluded his cross-examination.

The Bank's counsel stated that he believed that Mr. Willis planned to voluntarily appear as a witness at trial, but that on the Friday before trial, Mr. Willis advised the Bank's counsel that he had "medical issues" and would either appear in court on Monday or he

would be in surgery.  Mr. Willis did not appear at trial.  Because Mr. Willis, a non-party, is a resident of Parsons, Kansas (which is outside the scope of this Court's subpoena power), the Bank was not able to require Mr. Willis's attendance at trial, and therefore Mr. Willis is an "unavailable" declarant.  The Court further finds that Breedlove did not avail himself of ways to complete cross-examination at the deposition, and therefore his objection that the transcript itself is hearsay is overruled.  See Fed. R. Evid. 804(b)(1).

However, the Bank did not advise Breedlove that Mr. Willis may not appear (and that it intended to move for the admission of the entire Willis Transcript) until the morning of trial.  Nor was the Willis Transcript listed on the Bank's exhibit list.  Breedlove was entitled to have notice, prior to trial, of the portions of the transcript that the Bank intended to present so that he would have an opportunity to make evidentiary objections and to prepare rebuttal evidence, if appropriate.  Upon review of the Willis Transcript, the Court concludes that substantial portions of the testimony are not relevant, contain inadmissible hearsay, respond to leading questions, consist of pure speculation, are not based on personal knowledge, or are otherwise subject to valid evidentiary objections.  The Court will not undertake the task of ruling on objections that Breedlove did not have an opportunity to make, or of culling from the Willis Transcript the relevant and admissible testimony.  Breedlove's objection to the admission of the Willis Transcript is therefore sustained.

## IV.    Findings of fact

The Bank operates a bank in Parsons, Kansas.  Breedlove Automotive is a Kansas corporation formed in 1992, which operated an automobile dealership in Parsons from 1992

to September 2002.  At all times relevant to the issues in this case, Breedlove was the president and primary shareholder of Breedlove Automotive.  Breedlove Automotive had a banking relationship with the Bank from 1992 to October 2002.  Breedlove was also president of Breedlove Management, the entity that managed and operated Breedlove Automotive.

> A.     Relevant provisions of floor plan loan and security agreements

On February 9, 2001, Breedlove, as president of Breedlove Automotive, and Philip R. Eaton, as President of the Bank, executed the Floor Plan Financing Agreement–Used Vehicles (the "Floor Plan Agreement").  Bank Exhibit 1.  The Floor Plan Agreement generally provided that the Bank would advance funds to Breedlove Automotive upon receipt of a request that identified a specific used vehicle (a "Scheduled Vehicle") that would serve as collateral for the advance.  Floor Plan Agreement, ¶ 1.1(a).[16]  Pursuant to the Floor Plan Agreement, "upon the sale or disposition by [Breedlove Automotive] of any Scheduled Vehicle, . . . [Breedlove Automotive] shall within 3 days thereafter pay to the Bank an amount equal to the Loan Value of such Scheduled Vehicle . . ." (the "Three Day Payment Provision").  Id., ¶ 2.2(a).  Further, the Floor Plan Agreement provided that Breedlove

---

[16]The Floor Plan Agreement provided that a request for an advance would be made on a form purportedly attached to the agreement, but no form was actually attached. However, Bank representatives testified that the parties had been using a draw request form since 1994, and they continued to use the same form after the execution of the Floor Plan Agreement.

The Floor Plan Agreement also provided that advances would be deposited by the Bank into a specifically numbered Floor Plan Loan Account, but the account number set forth on the Floor Plan Agreement was different from the operating account into which the Bank actually deposited advances.  However, it does not appear that Breedlove Automotive ever complained that the Bank had been advancing funds into the wrong account.

Automotive "agrees to utilize the proceeds of all sales and dispositions of Scheduled Vehicles, to make the above described payments to Bank." Id. In return, the Bank promised to make advances as requested and apply payments as a reduction of principal of the balance owed on the line of credit related to the floor plan financing.

The Floor Plan Agreement was executed contemporaneously with a Note and Security Agreement dated February 9, 2001 (the "2001 Note and Security Agreement"), and with another agreement that defined the Bank's obligation to advance up to one million dollars to Breedlove Automotive in connection with the Note and Security Agreement. Breedlove Exhibits 1, 2. The 2001 Note and Security Agreement specifically refers to the "Floor Plan Agreement dated 02/09/01" in connection with the description of collateral securing the indebtedness. The agreement also states that "[t]he purpose of this loan is Inventory for Used Car Floor Plan." The 2001 Note and Security Agreement and the untitled agreement were executed in connection with Loan Number 1014534. Under these agreements, the loan matured on February 9, 2002.

On or about February 9, 2002, by virtue of a Commercial Promissory Note and Security Agreement, the Bank renewed Loan 1014534 and extended the maturity to August 9, 2002. Breedlove Exhibit 4. Breedlove Automotive and the Bank also entered into a Commercial Line of Credit Agreement and Note dated February 9, 2002, which relates to the same indebtedness as the 2001 Note and Security Agreement, but obligates the Bank to advance funds to Breedlove Automotive upon demand up to a maximum sum of $876,000. Breedlove Exhibit 5.

On or about August 9, 2002, the Bank again renewed Loan 1014534, by virtue of a Commercial Promissory Note and Security Agreement (the "2002 Note and Security Agreement") and a Commercial Line of Credit Agreement (the "2002 Line of Credit Agreement") in a form virtually identical to the agreements executed on February 9, 2002, which extended maturity to February 9, 2003.  Breedlove Exhibits 6, 7.

The 2002 Note and Security Agreement also provided that the "loan is payable in [monthly] interest only payments.  Principal, accrued interest and other charges are due on the Maturity Date."  Id.  The 2002 Line of Credit Agreement provided that advances made by the Bank would be secured as set forth in the 2002 Note and Security Agreement.  The security agreement described the collateral securing the indebtedness as including "Inventory, including but not limited to the used unit inventory list for Breedlove Automotive Group, Inc. dated 2/12/02 and additions and substitutions on future lists.  Floor Plan Agreement dated 2/9/01."  The Floor Plan Agreement, the Note and Security Agreement dated February 9, 2001, the untitled agreement, the February 9, 2002 agreements, and 2002 Note and Security Agreement, and the 2002 Line of Credit Agreement are all documents executed in the course of the same transaction, and therefore are construed together.  Loan number 1014534 is sometimes referred to herein as the Floor Plan Line of Credit.

   B.    Relevant provisions of Equipment and Inventory Loan

Also on or about August 9, 2002, Breedlove, on behalf of Breedlove Automotive, executed a note in the principal amount of $686,346.12, which constituted a renewal and consolidation of three prior notes.  Bank Exhibits 37, 57, 87.  This loan, identified as Loan

number 1015990, was secured by equipment, inventory, accounts, general intangibles, two mortgages, and other collateral (the "E & I Loan").  Id.   A copy of the August 9, 2002, note and security agreement was not introduced into evidence at trial, so the Court is unaware of the payment terms of the note.  The Loan History indicates that no payments were made on the note before Breedlove Automotive ceased doing business in September 2002, but thereafter the balance was reduced by six principal payments totaling $337,626.08, and a collateral sale of $22,000.00.  The Bank recorded a charge off of $150,000.00 on December 22, 2003, and as of the Petition Date, the balance was $176,720.04.  Loan History, Bank Exhibit 37.

C.     Guaranty

On or about October 12, 1995, Breedlove signed an agreement in which he personally guaranteed all existing and future debts of Breedlove Automotive.  Guaranty, Bank Exhibit 69.

D.     Course of dealing regarding Floor Plan Agreement

Barbara Thompson began working as office manager of Breedlove Automotive in January 2001.  Thompson Transcript, Bank Exhibit 115, at 153.  The Floor Plan Agreement was executed approximately one month later.  In 2001, although Breedlove Automotive generally did remit proceeds from the sale of Scheduled Vehicles (hereinafter referred to as "floor-planned vehicles") to the Bank, the Bank did not require Breedlove Automotive to report the payment as the proceeds of the sale of any particular vehicle.  Id. at 154-55, 163, 201-05.  At that time, the Bank would periodically review Breedlove Automotive's used car

inventory and determine whether the inventory value was more or less than the balance on the Floor Plan Line of Credit.  Id. at 154-55, 201.[17]  Breedlove Automotive was permitted to draw on the line of credit up to the value of the inventory.  Id.  If the value of the inventory was less than the balance on the credit line, the Bank informed Breedlove Automotive and required a payment.  Id.[18]  Thus, the Bank did not require strict compliance with the terms of the Floor Plan Agreement.

At some point prior to August 2002, the Bank performed a floor plan inspection of Breedlove Automotive's used car inventory and found the value of the inventory was less than the balance of the Floor Plan Line of Credit.   At that time, the Bank began requiring Breedlove Automotive to remit proceeds from the sales of identified Scheduled Vehicles, and the Bank began matching advances and payments with Scheduled Vehicles, rather than advancing on gross inventory value.  Also sometime in 2002, the Bank began holding the titles to floor-planned vehicles which would be released upon receipt of a check for the vehicle's loan value.  Thompson Transcript at 210-11.  The Bank required Breedlove Automotive to advise the Bank when a floor-planned vehicle was sold and to remit the loan

_____

[17]The Bank only sporadically performed physical inspections of the inventory. Thompson Transcript at 165.  When Thompson began working as office manager in January 2001, no physical inspections were performed by the Bank.

[18]Additionally, as a matter of course, Breedlove Automotive often transferred funds to Breedlove Nissan and vice versa, when funds were needed by one company or the other for payroll or other expenses.  Thompson Transcript at 70.  In addition, Breedlove Automotive would sometimes transfer funds advanced on the Floor Plan Line of Credit to its payroll account.  Id. at 71.  Thompson had discretionary authority to request advances on the Floor Plan Line of Credit when the inventory was sufficient and to pay other expenses with the funds.  Id. at 72-73.

value of the each used vehicle.  Id.  Neither Thompson nor the Bank could recall when the procedure and criteria for obtaining advances on the line of credit changed from a total inventory minus loan balance basis to an identified vehicle basis.  It could have been as early as mid-2001 or as late as the summer of 2002.[19]  The Bank did not strictly enforce the provision in the Floor Plan Agreement that required payment of proceeds within three days of the sale of a floor-planned vehicle, however.  Thompson testified that Breedlove Automotive would pay the Bank as funds were available, and except for during the last month of business, always within thirty days, because Breedlove Automotive was obligated to provide its purchaser with the title within thirty days of sale.

The Bank kept track the purchase and sale of floor-planned vehicles on an internally generated spreadsheet called the Breedlove Floorplan Tracking Report, Bank Exhibit 33.  Mr. Feess, a Bank representative, testified that he or his staff would add a vehicle to the spreadsheet when the Bank advanced funds to permit Breedlove Automotive to purchase a vehicle, and deleted the vehicle from the spreadsheet when the Bank received funds identified as proceeds of the particular vehicle.

    E.    Financial condition of Breedlove Automotive

Like many businesses, Breedlove Automotive was affected by the events of September 11, 2001.  After September 11, 2001, more purchasers of Breedlove Automotive's

---

[19]Thompson testified that she would have been able to determine the date the procedure changed by reviewing Breedlove Automotive's ledger books, but those books and records were not available.  Thompson Transcript at 204-05.  The books and records were left at Breedlove Automotive when it closed on September 25, 2002.  The location of the records was not disclosed at trial, but apparently the records were not obtained during discovery by either Breedlove or the Bank.

vehicles defaulted on installment agreements that Breedlove Automotive had assigned to the Bank, and Breedlove Automotive became liable to the Bank for deficiencies after the Bank repossessed and sold the vehicles. Thompson Transcript at 159. Paying deficiencies reduced the amount of revenue available to repay advances made by the Bank to permit Breedlove Automotive to purchase floor-planned vehicles. In addition, after September 11, 2001, Breedlove Automotive experienced a decrease in sales of vehicles. Accordingly, Breedlove Automotive reduced its sales force, and Breedlove personally invested more funds in Breedlove Automotive and became more personally involved in its management in an attempt to maintain the business. Thompson Transcript at 144-46. The Bank was aware of Breedlove Automotive's financial difficulties in 2001 and 2002. Thompson Transcript at 160-61, 187-91. Bank representatives called her often, sometimes daily, regarding negative operating account balances. Id.[20] When the account had a negative balance, proceeds of floor-planned vehicles deposited into the account would first be applied against overdrafts, which resulted in the proceeds not being available to pay off the advance of any particular floor-planned vehicle. Id. at 161. Based upon the Bank's continuous oversight of Breedlove Automotive's accounts, and its right to inspect the floor-planned inventory, the Bank was, or should have been, aware of Breedlove Automotive's precarious financial position,

---

[20]The operating account was considered the "floor plan account," that is, the account into which the Bank deposited advances on the floor plan line of credit and the account into which Breedlove Automotive deposited proceeds of sold floor-planned vehicles. However, it appears that all revenues generated by Breedlove Automotive, including revenue from the sale of new cars and for service and parts, were deposited into the operating account, and all operating expenses, including payments to GMAC for new car inventory, were paid from the operating account.

including any failure to remit proceeds of the floor-planned vehicles, on August 9, 2002, the date on which the Bank renewed the Floor Plan Line of Credit.  Id. at 188-90.

Breedlove continued to cause Breedlove Automotive to make substantial payments to the Bank both before and after Breedlove Automotive renewed its Floor Plan Line of Credit and the E&I Loan.  In August 2002, the Bank advanced $335,845.00 to Breedlove Automotive, and during that same period, Breedlove Automotive wrote forty-six checks to the Bank in the amount of $426,620.80.  Bank Exhibit 116, Tab 5 at 72; Breedlove Exhibit 12.   In addition, in August 2002, Breedlove Nissan made payments to the Bank in the amount of $20,235.65.[21]  Notably, Breedlove Automotive made two interest payments on the Floor Plan Line of Credit in August 2002.  In September 2002, the Bank made no advances to Breedlove Automotive, and Breedlove Automotive made payments to the Bank in the amount of $58,637.26.  Breedlove Exhibit 13; Bank Exhibit 116, Tab 6 at 42.  Some of Breedlove Automotive's payments were proceeds of sales of floor-planned vehicles, which were to be applied against the amount advanced on account of a certain vehicle in order to obtain the release of the title of the vehicle so that title could be transferred to the purchaser. Thompson Transcript at 78.  Some payments were made to pay off an installment loan (and to obtain a lien release) on behalf of a purchaser who traded in a vehicle that was financed by the Bank.  Id.  Other payments may have been for deficiencies on customers' installment loans that were assigned to the Bank and for which Breedlove Automotive remained liable after the Bank repossessed and liquidated a vehicle from a Breedlove Automotive customer.

---

[21]Breedlove Nissan did not have a lending relationship with the Bank; how the Bank applied the funds received from Breedlove Nissan is not apparent.

Thus, the proceeds of the sales of floor-planned vehicles that were not remitted to the Bank to release the floor-planned vehicle may have been paid to the Bank to cover the deficiencies from the Bank's repossessions, or used to pay other legitimate business expenses, including payroll, taxes, and other general and administrative expenses.

In the summer of 2002, Breedlove Automotive's operating account was consistently overdrawn and Breedlove Automotive's cash flow was insufficient to maintain operations and its debt service.

In August 2002, Breedlove began negotiating with other dealers in an effort to sell Breedlove Automotive and Breedlove Nissan in order to pay off the accrued debt. Breedlove Exhibit 23, 25. The Bank was aware of Breedlove's efforts and was involved in some of the negotiations. Breedlove Exhibit 25. Thompson testified that Sam Allega, on behalf of Royal Motors, an entity from Coffeyville, Kansas, was planning to take over management of Breedlove Automotive on September 25, 2002, but when that day came, the parties still had not yet agreed on the financial terms of the sale. Thompson Deposition at 42-43. Ultimately, Breedlove's efforts to sell the dealership failed, and Breedlove Automotive closed on September 25, 2002. Id. at 184-85.

F.    Breedlove Automotive sold vehicles without remitting proceeds to the Bank

In July 2002, as a result of an inventory audit, the Bank discovered that sixteen vehicles had been sold but the proceeds had not yet been paid to the Bank, *i.e.*, the vehicles were sold "out of trust."[22] The Bank notified Breedlove of his obligation to pay the proceeds

---

[22]"Out of trust" is a term of art among dealers and lenders that refers to the failure of a dealer to remit to the lender the required portion of the proceeds of a floor-planned vehicle

to the Bank by letter dated July 11, 2002.  Apparently, Breedlove eventually complied with the Bank's request for submission of the proceeds for these vehicles because a Bank representative testified that it was satisfied with an audit conducted by the Bank immediately prior to the renewal of the loans on August 9, 2002.  Between August 8, 2002, and August 26, 2002, Breedlove Automotive sold sixteen additional floor-planned vehicles without complying with the Three Day Provision for paying the Bank the loan value of the vehicles sold.  Breedlove Exhibit 15; Thompson Transcript at 46-49, 142-43.  Although Thompson could not remember any particular vehicle for which the Bank was not paid, she did recall that she wrote checks to Commercial Bank upon the sale of floor-planned vehicles and that in some instances, the checks were not signed and submitted to Commercial Bank because Breedlove Automotive did not have funds in its operating account to cover the checks.  In the final month of Breedlove Automotive's existence, even though it did not have sufficient funds to obtain the release titles to vehicles it sold, Breedlove Automotive requested the Bank to release the titles to the purchasers, and the Bank did so because the buyers were *bona fide* purchasers for value without notice of the Bank's interest in the vehicles, and thus the Bank did not have the right to withhold the titles from such purchasers.

In August  2002, Breedlove also sold some new vehicles subject to a floor plan agreement with GMAC and failed to remit proceeds to GMAC.  Upon discovery that vehicles

---

upon the sale of the vehicle.  Notwithstanding the use of trust terminology, a floor plan agreement containing the requirement that proceeds be remitted to the lender does not mean that the dealer holds the proceeds in trust for the dealer or that the floor plan agreement creates a fiduciary relationship for the purposes of considering whether a debt is dischargeable.  See, e.g., Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934).

in which it had a security interest were sold "out of trust," GMAC placed representatives at the dealership to monitor sales of new vehicles and application of the proceeds;[23] these representatives arrived on August 25, 2002, and remained at Breedlove Automotive until the dealership ceased doing business on September 25, 2002.  When GMAC arrived at the dealership, many Breedlove Automotive employees "walked out."  Thompson Transcript at 167.  In a Forbearance Agreement dated September 5, 2002, Breedlove admitted that Breedlove Automotive sold certain new vehicles in which GMAC had a security interest without remitting the proceeds therefrom (totaling $149,089.55) to GMAC.  Forbearance Agreement dated September 5, 2002, attached to Breedlove Transcript, Bank Exhibit 114.[24]

According to the Bank's Floorplan Tracking Report dated October 4, 2002, Breedlove Automotive had failed to pay the Bank $127,935 that was due upon the sale of sixteen floor-planned vehicles.  Bank Exhibit 33.  According to another document prepared by the Bank, the "Breedlove Automotive Group 'Out of Trust Vehicles'" list, Breedlove Exhibit 15, the Bank contends that Breedlove Automotive owed the Bank $187,429.90 for sixteen floor-planned vehicles sold between August 7, 2002, and August 26, 2002, that two floor-planned vehicles were unaccounted for, and that two floor-planned vehicles in

---

[23]GMAC performed physical inspections of the new vehicle inventory on a regular basis.  Until August 2002, Breedlove Automotive's inventory was always found in compliance by GMAC. Thompson Transcript at 166-67. In August 2002, GMAC found Breedlove Automotive "out of trust" and immediately installed monitors on the premises. Id.

[24]In a second Forbearance Agreement dated September 5, 2002, Breedlove admitted that Breedlove Nissan sold certain new vehicles in which GMAC security interest without remitting the proceeds therefrom (totaling $48,535.24) to GMAC.  Forbearance Agreement dated September 5, 2002, attached to Breedlove Transcript, Bank Exhibit 114.

inventory (which was repossessed by the Bank) were encumbered with prior liens in the total amount of $49,000 which Breedlove Automotive had failed to pay upon receipt of advances sufficient to pay the liens.[25]  These two documents contain inconsistencies and the Court is not sure which document, if either, is accurate.

The Loan History for the Floor Plan Line of Credit shows a stream of payments made after the closure of Breedlove Automotive, and one charge-off of $85,941.66, all of which appear to reduce the balance to $76,166.66 as of the petition date.[26]  The Bank had a security

---

[25]When examined about the disposition of these vehicles at his deposition, Breedlove invoked his right under the Fifth Amendment of the United States Constitution.  Breedlove Transcript, Bank Exhibit 114, at 50-65.  The Court may, but is not required to, draw an inference adverse to a witness that refuses to answer a question in a civil proceeding by claiming rights under the Fifth Amendment.  See Daniels v. Pipefitters' Ass'n Local Union No. 597, 983 F.2d 800, 802 (7th Cir. 1993); Nat'l Acceptance Co. v. Bathalter, 705 F.2d 924, 932 (7th Cir. 1983) (judgment may not be based solely on allegations that are uncontroverted due to a civil defendant's invocation of Fifth Amendment privilege; plaintiff still must present affirmative evidence of all elements of its case).  The Court concludes that the Bank presented sufficient evidence that the vehicles listed on Breedlove Exhibit 15 were sold and that proceeds were not paid to the Bank, and the Court further draws an adverse inference from Breedlove's failure to deny that the sales occurred and failure to deny that the proceeds were not paid to the Bank.  From his failure to testify, the Court cannot draw any adverse inference as to Breedlove's state of mind when these events occurred, however.

[26]The Loan History for the Floor Plan Line of Credit (Bank Exhibit 6) includes numerous transactions which the Bank could not explain, such as events labeled principal payments which did not in fact reduce the principal balance.  The Loan History omits some payments made to the Bank by check in August 2002 (see Breedlove Exhibits 11, 12), and because these payments were not reflected on the loan history for the E&I Loan either (Bank Exhibit 37), there is no evidence before the Court indicating how the Bank applied these payments.  In addition, the Loan History reflects "principal payments" and "advances" on the Floor Plan Line of Credit after Breedlove Automotive ceased to do business.  The Bank's representative testified that these principal payments were actually the application of the proceeds of sales of the Bank's collateral; however, the transactions were not coded as "Collateral Sales."  In addition, the Bank did not explain why "advances" were made after September 25, 2002, or to whom they were made.

The Loan History also reflected a principal payment of $328,727.74 in August 2003,

interest in Breedlove Automotive's accounts receivable.  Bank Exhibit 4.  Breedlove

Automotive's accounts receivable included installment payments from purchasers of

vehicles.  Thompson Transcript at 200-01.  While the Bank could not explain why the loan

history reflected payments on the loan after Breedlove Automotive ceased to do business,

those payments may have been from sales of collateral or the receipt of installment payments.

G.      Breedlove's use of Breedlove Automotive's funds for personal expenses

Generally, Breedlove Automotive paid Breedlove for his managerial services by

making periodic payments to Breedlove Management.  From January 2002 to September

2002, Breedlove Automotive paid Breedlove Management a total of $100,530.49.  Bank

Exhibit 116, Tab 5A at 2-3.  Breedlove Nissan also made periodic payments to Breedlove

Management.  Breedlove, Donna Breedlove, and other members of the Breedlove family then

drew funds from Breedlove Management, presumably to pay their personal living expenses.

Breedlove Automotive also paid $375 per month directly to Donna Breedlove.  In addition,

Breedlove Automotive paid various personal expenses on behalf of Breedlove, including

monthly installment payments of approximately $2,800 on a boat that Breedlove purchased

in the summer of 2001, and expenses that related to the boat (marina, club, storage,

maintenance, etc.).  The boat installment payments and boat-related expenses for the period

of January 2002 to August 2002 totaled approximately $30,000.  Bank Exhibit 116, Tab

---

but Bank representatives testified that that event was a "charge off," not a principal payment.
However, the Loan History reflects a different transaction code for a charge off.  Based upon
errors in the Loan History, and payments for which the Bank did not account, the Court
cannot give much weight to the balances expressed on the Loan History.

5A.[27]  However, during the period the Bank claims that Breedlove sold vehicles "out of

trust," *i.e.*, August 2002, Breedlove Automotive paid only one installment payment of

$2,790.00, and did not pay any other boat-related expenses.  Id.

Tab 5A of Ms. Sparks' report purports to list personal expenses incurred by Breedlove

and paid by Breedlove Automotive.  Expert Report, Bank Exhibit 116.  Tab 5A indicates that

in August 2002, the Breedlove Automotive LaBette County Bank VISA card was used to

purchase goods or services from Collector's Universe, Creative Car Audio, Fine Airport

Parking, Heritage Rare Coin, John Stewart Nitro, Marriott, Moving Image Collecting,

OnStar, Paypal, Summitracing, and U.S. Mint Sale.  Id.  During July 2002, Breedlove

Automotive paid approximately $3,700 on the LaBette County Bank VISA account (the

"VISA Account"), which may have included payment for some personal expenses incurred

prior to July 2002, but Breedlove Automotive did not make any payments on the VISA

Account thereafter.  Id., Tab 5 at 56; Tab 10 at 18.  Tab 10 of Ms. Sparks' report, which

summarizes the VISA account transactions, indicates that on September 15, 2002,

$20,683.30 was due on the VISA Account and that as of November 15, 2002, the account

had not been paid by Breedlove Automotive or anyone else.  Thus, during the months of

August and September 2002, the only period in which the Bank alleges that Breedlove

Automotive was "out of trust," Breedlove did not use funds obtained from selling floor-

planned vehicles to purchase coins, sports equipment, audio equipment, or items on paypal,

---

[27]These expenses include payments to U.S. Bank and FirstStar Bank (holders of the
note), Arrowhead Yacht Club, King's Marine and Thunder Bay Marina.  Bank Exhibit 116,
Tab 5A.

or to take vacations, as alleged by the Bank.  Breedlove may have purchased such items with the VISA card, but no funds of Breedlove Automotive were used to pay the VISA Account bill.

      H.     Purchase of home in Bixby, Oklahoma

On October 17, 2002, Donna Breedlove executed a check on her Southwest Missouri Bank ("SMB") checking account payable to Delta Title Company in the amount of $20,000 as earnest money for the purchase of 11517 South 67th East Avenue, Bixby, Oklahoma. Expert Report, Bank Exhibit 116, Tab 15.  According to Ms. Sparks' summary of deposits to and transfers from on Donna Breedlove's SMB account, the $20,000 earnest money check was paid from funds deposited in October 2002, which included "rent payments" from individuals in nominal amounts and a $25,000 deposit of "loan proceeds" obtained from SMB.  Id., Tab 11, at 2, 3.  The Court concludes that the earnest money is not traceable to funds received by Breedlove Automotive as payment for the "out of trust" vehicles.

On November 5, 2002, Donna Breedlove obtained from SMB a cashier's check payable to Delta Title in the amount of $140,000, which was later credited toward the purchase of the Bixby home.  Id., Tab 11, at 4; Tab 15.  According to Ms. Sparks' summary, the source of those funds appears to be a sale of assets resulting in two deposits of approximately $49,000 and $83,000, respectively, into Donna Breedlove's SMB checking account.  The $49,000 deposit on October 25, 2002, consisted of two cashier's checks that indicated Tulsa Gold and Silver as the remitter.  Id.  Although the Bank implies that the assets Breedlove sold to Tulsa Gold and Silver were purchased with the proceeds of the "out

33

of trust" vehicles, there is insufficient evidence to establish that Breedlove Automotive's funds were used during the period of August 2002 to purchase coins or metals or any other assets that might have been sold to Tulsa Gold and Silver.[28]  According to Ms. Sparks' schedules, on November 5, 2002, Donna Breedlove deposited $83,000 obtained from First American Title Missouri Agency.  Id.  The Court assumes that the title agency disbursed these funds as a result of a closing of the sale of some parcel real estate.  The Bank does not contend that these funds derived from real estate (or any other collateral) in which the Bank held a security interest.  The Court finds that the Bank has not established that the Bixby home was purchased with any funds derived from the Bank's collateral.

I.    Breedlove's personal bankruptcy

Following the termination of the dealerships, and Breedlove's loss of income, Breedlove's creditors repossessed the assets of the dealerships, including the vehicle inventories, various parcels of commercial real estate, furniture, fixtures, and equipment, as well as personal assets, including the 2000 boat, a 2003 Grand Am, a 2002 Avalanche, a 1999 Sonoma, a 2000 Maxima, a 2000 Harley Davidson motorcycle and 200 ounces of gold. Statement of Financial Affairs, ¶ 5.  On February 27, 2004, Breedlove filed a petition for relief under Chapter 7 of the Bankruptcy Code.  In his schedules, he lists the Bank's claim of $1,600,000 as contingent and disputed.

---

[28]Again, while charges of a personal nature and for personal or investment assets may have been made on the VISA Account in August 2002, Breedlove Automotive did not make any payments on the VISA Account after July 2002.

**V.      Conclusions of law**

A.      <u>Burden of proof</u>

Exceptions to discharge are narrowly construed in favor of the debtor.  <u>See</u> <u>Bellco</u>

<u>First Federal Credit Union v. Kaspar (In re Kaspar)</u>, 125 F.3d 1358, 1361 (10th Cir. 1997).

The party seeking to except its claim from discharge must prove all elements of the discharge

exception by a preponderance of the evidence. <u>See</u> <u>Grogan v. Garner</u>, 498 U.S. 279, 287

(1991).[29]

B.      <u>The Bank's Section 523(a)(2)(A) claim</u>

Section 523(a)(2)(A) excepts from discharge any debt

(2) for money, property, services, or an extension, renewal, or refinancing of
credit, to the extent obtained by–

(A) false pretenses, a false representation, or actual fraud, other
than a statement respecting the debtor's or an insider's financial
condition.

11 U.S.C. § 523(a)(2)(A).  To obtain a judgment that a debt is not dischargeable under this

section, the Bank must prove–

(1) That a representation was made by the debtor;

(2) That the representation was false;

(3) That the representation was made with the intent to deceive the creditor;

---

[29]At the conclusion of the Bank's evidentiary presentation, Breedlove moved for a directed verdict, which the Court considers a motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.  Although the Court took the motion of whether the Bank met its burden of proof in its case in chief under advisement, the Court ultimately heard and has considered evidence presented by Breedlove in his defense, and therefore the motion is denied as moot.

(4) That the creditor relied upon the representation; and

(5) That, as a result of such reliance, the creditor suffered loss.

Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996).  In addition, the Bank must prove that reliance on the representation was justifiable.  Field v. Mans, 516 U.S. 59, 74-75 (1995).  The Bank contends that Breedlove obtained the renewal of the Floor Plan Line of Credit and the E&I Loan by falsely representing Breedlove Automotive's intention and ability to repay the Bank.

Debts induced by fraudulent statements relating to a debtor's or insider's overall financial condition are excepted from discharge only if the fraudulent statements were presented to the creditor in writing.  Cadwell v. Joelson (In re Joelson), 427 F.3d 700, 714 (10th Cir. 2005); Kaspar, 125 F.3d at 1362 ("Congress has provided deception made in statements of financial condition must be in writing before a creditor is entitled to an exception from discharge").  Breedlove did not provide the Bank with a written statement of Breedlove Automotive's financial condition in connection with the renewal of the Floor-Plan Line of Credit or the E&I Loan.  To the extent that the Bank contends that it relied upon any false oral statement or implication by Breedlove that Breedlove Automotive's overall financial condition was sufficient to render it able to repay the loans, the Bank fails to state a claim under Section 523(a)(2)(A).[30]

––––––––––––––––––––

[30]From its close monitoring of Breedlove Automotive's operating account, which was often overdrawn, the Bank was also aware that Breedlove Automotive was experiencing a cash flow crisis at the time the loans were renewed, and therefore any reliance on any oral or implied representation of financial stability would not have been justifiable in any event.

Under Joelson, reliance on an oral misrepresentation of a fact other than overall financial condition may result in a non-dischargeable debt.  Joelson, 427 F.3d at 715. However, the Bank failed to establish that prior to renewing the loans on or about August 9, 2002, Breedlove made *any* representation that was false.  Notwithstanding that Philip Eaton, president of the Bank, testified that he would not have renewed the loan on August 9, 2002, had he known that Breedlove Automotive was "out of trust," the Bank had the ability to monitor its collateral, and had been monitoring the collateral and advising Breedlove Automotive when its collateral tracking did not match the inventory on the lot.  As late as July 12, 2002, the Bank knew of sixteen vehicles for which Breedlove Automotive had not transmitted proceeds.  Mr. Feess testified that he did a floor-plan audit immediately prior to the renewal date and that Breedlove Automotive was not "out of trust" at that time.  The Bank had the opportunity to monitor the status of the floor planned vehicles and had knowledge of Breedlove Automotive's payment practices prior to renewing the loans.  Thus, to the extent the Bank contends Breedlove made an oral or implied representation about the status of the Bank's collateral (*i.e.*, that Breedlove Automotive was not "out of trust"), the Court finds that such a representation was in fact true at the time, and further that any reliance by the Bank on a implied or actual representation of the status of the collateral would not have been  justifiable because the Bank could and did perform its own floor plan audit.

The Bank also contends that when Breedlove executed the renewal documents on behalf of Breedlove Automotive, he did not intend to cause Breedlove Automotive to pay the Bank as promised.  However, the Bank presented insufficient evidence of a lack of intent.

Moreover, Breedlove's conduct after the loans were renewed provided sufficient circumstantial evidence of an intent to satisfy Breedlove Automotive's debt to the Bank.[31] After renewing the loans, Breedlove caused Breedlove Automotive to continue making substantial principal and interest payments to the Bank (as well as other payments to the Bank not accounted for in the Loan Histories) while Breedlove actively sought a buyer for the dealership.[32]  With respect to the "out of trust" vehicles, checks constituting proceeds were written to the Bank, but Breedlove Automotive's operating account did not have

---

[31]At the deposition of Bank president Philip Eaton, Breedlove's counsel inquired about the allegation in the Complaint which stated that "Breedlove obtained an extension, slash, renewal of the E&I loan when he fraudulently represented to Commercial Bank that the loan would be paid back.  What fraudulent representation are you talking about?"  Mr. Eaton could not recall any fraudulent representations.  Eaton Transcript, Breedlove Exhibit 8, at 151.    Breedlove's counsel also inquired about alleged fraudulent representations in connection with the August 2002 renewal of the Floor Plan Line of Credit.  Again, Mr. Eaton could not recall any representations made by Breedlove that were false.  Id. at 152.   Mr. Eaton was also asked:  "Did Steve Breedlove ever tell you he had no intention of repaying the bank?"  Mr. Eaton replied: ". . . I guess he didn't tell me that . . . He didn't . . . [pay it back] though."  Eaton Transcript at 151, 152.

[32]Mr. Eaton recalled that Breedlove made contact with several individuals in an effort to sell the dealership in August or September 2002. Eaton Transcript at 153-54.  When asked why he thought Breedlove had placed Breedlove Automotive on the market, Mr. Eaton stated: "Well, I think he realized that he was having pretty strong financial problems. General Motors, or GMAC, came in and took over the new car inventory because they were out of trust."  Mr. Eaton further testified as follows–

Q:    Wasn't the purpose of selling the dealership, so that Commercial Bank would be repaid?
A:    All the creditors would be repaid, yeah.
Q:    And Commercial Bank was one of the largest creditors, were they not?
A:    Sure.
Q:    So there were efforts on the part of Mr. Breedlove to sell the assets, sell the business, and repay Commercial Bank?
A:    There seemed to be, yes.

Eaton Transcript at 155.

sufficient funds to cover the checks and therefore the checks were never delivered to the Bank.  In addition, while Breedlove continued to draw his salary (payable to Breedlove Automotive) in August 2002, and caused Breedlove Automotive to make one boat payment, Breedlove did not loot the coffers of Breedlove Automotive or attempt to enrich himself at the expense of the Bank.  While "out of trust," Breedlove did not cause Breedlove Automotive to pay boat-related expenses or the VISA Account instead of paying the Bank. Ultimately, Breedlove Automotive's cash flow was simply insufficient to maintain its operations and its debt service.  Two weeks after the loan renewals were executed, GMAC appeared on-site and Breedlove Automotive's employees rebelled; yet Breedlove still attempted to maintain Breedlove Automotive's operations by executing forbearance agreements with GMAC.  Upon the failure of negotiations for the sale of his dealerships, Breedlove Automotive and Breedlove Nissan were closed, and Breedlove allowed GMAC, the Bank, and other business lenders to repossess their collateral.  In addition, lenders foreclosed on Breedlove's personal vehicles, motorcycle, and boat.  It was only after Breedlove's businesses imploded that the Breedloves liquidated personal assets in order to purchase a home in Oklahoma.[33]  None of these actions leads the Court to believe that when Breedlove executed the loan renewals on behalf of Breedlove Automotive, he lacked the

---

[33]While the purchase of the Bixby home with proceeds of the sale of non–exempt assets may have been calculated to take advantage of the generous homestead exemption afforded by the State of Oklahoma, and thus maximize Breedlove's exempt assets in an attempt to protect his personal property from seizure by creditors, the Bank has not asserted a claim for fraudulent transfer in this proceeding nor has it challenged the legitimacy of Breedlove's homestead exemption.

intent to maintain Breedlove Automotive as a going concern (or sell it) or to make a genuine effort to repay the Bank.

The Bank failed to establish any of the elements of Section 523(a)(2)(A), and therefore Breedlove's debt to the Bank is not excepted from discharge pursuant to Section 523(a)(2)(A).

C.      The Bank's Section 523(a)(6) claim

Section 523(a)(6) provides that a debt is excepted from discharge if the debt is a result of "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The Bank contends that by selling vehicles in which it had a security interest and not paying the proceeds to the Bank within three days of sale, as required by the Three Day Payment Provision of the Floor Plan Agreement (*i.e.*, selling floor-planned vehicles "out of trust"), Breedlove willfully and maliciously injured the Bank or its property. Accordingly, the Bank argues, Breedlove owes the Bank a debt equivalent to the amount owed by Breedlove Automotive on the vehicles sold "out of trust," which is approximately $237,000, and asserts that the debt is not dischargeable.

The United States Supreme Court has held that sale of collateral without remitting the proceeds to the secured party constitutes conversion of collateral, but that not all conversions of collateral are willful and malicious. See Davis v. Aetna Acceptance Co., 293 U.S. 328 (1934). In Davis, the debtor, an automobile dealer, borrowed funds from Aetna to purchase inventory, and executed notes secured by the vehicles, which notes provided that the debtor would not sell or otherwise dispose of the vehicles except upon consent of the lender. Davis,

293 U.S. at 330.  However, during the course of the relationship between the debtor and the

lender, the debtor often sold vehicles without the lender's consent and made a corresponding

payment to the lender sometime after the sale, which practice the lender tacitly condoned.

Id.  At the time the debtor filed bankruptcy, the debtor still owed the lender for one of the

vehicles it had sold.  Id. The lender sued the debtor for conversion and the debtor asserted

his discharge in defense.  Id.  Under the Bankruptcy Act (and under the current Bankruptcy

Code), debts excepted from discharge included those for "willful and malicious injuries to

the person or property of another."  Id. at 331.  The trial court concluded that because the

debtor converted the creditor's collateral, the debt was excepted from discharge; the debtor

appealed to the United States Supreme Court.   In interpreting the discharge exception, the

Supreme Court explained–

> There is no doubt that an act of conversion, if willful and malicious, is an
> injury to property within the scope of this exception. . . .  But a willful and
> malicious injury does not follow as of course from every act of conversion,
> without reference to the circumstances.  There may be a conversion which is
> innocent or technical, an unauthorized assumption of dominion without
> willfulness or malice. . . .  (citations omitted).  There may be an honest but
> mistaken belief, engendered by the course of dealing, that powers have been
> enlarged or incapacities removed.  In these and like cases, what is done is a
> tort, but not a willful and malicious one.

Id. at 332.  The Supreme Court held that based on the prior course of dealing between the

debtor and the lender, in which the lender tolerated the debtor's sales of vehicles without

prior consent and without immediately remitting the proceeds to the lender, it concluded that

the debtor was not motivated by a malicious intent to injure the lender when it acted in

conformity with the established course of dealing. Id. Thus, the debt was not excepted from the discharge.

Courts in this circuit continue to recognize the vitality of the principles set forth in Davis following the enactment of the Bankruptcy Code in 1978, and Davis provides the foundation for an analysis of whether a debt arising from the breach of a pay-as-sold term of a floor-plan financing agreement is non-dischargeable under Section 523(a)(6). See, e.g., Kawaauhau v. Geiger, 523 U.S. 57, 63 (1998); Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley), 235 B.R. 651, 657 (B.A.P. 10th Cir. 1999); Bombardier Capital, Inc. v. Tinkler (In re Tinkler), 311 B.R. 869, 877 (Bankr. D. Colo. 2004); Ford Motor Credit Co. v. Talcott (In re Talcott), 29 B.R. 874, 879 (Bankr. D. Kan. 1983).

To prevail on its Section 523(a)(6) claim, the Bank must first establish that Breedlove *willfully* injured the Bank or its property. The Supreme Court has clarified that Section 523(a)(6) excepts from discharge debts arising from intentional torts, that is, acts taken with an *intent to injure* the creditor. Geiger, 523 U.S. at 61-62. In the context of injury to a creditor's collateral, a "willful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property . . . [or] evidence of both the debtor's knowledge of the creditor's . . . rights and the debtor's knowledge that the conduct will cause particularized injury." Longley, 235 B.R. at 657. Whether by direct or circumstantial evidence, the creditor must establish that the debtor *subjectively* intended to injure the creditor. Tinkler, 311 B.R. at 879, *quoting* Via Christi Regional Medical Ctr. v. Englehart (In re Englehart), No. 99-3339, 2000 WL 1275614 (10th Cir. Sept. 8, 2000) (unpublished)

42

("the 'willful and malicious' exception . . . turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur").

Although the Court concludes that Breedlove knew of the Bank's right to the proceeds of the floor-planned vehicles, there was no direct evidence that Breedlove had the specific intent of harming the Bank when he failed to immediately remit the proceeds to the Bank. Although Breedlove must have known that the Bank would be injured if he was not able to eventually rehabilitate Breedlove Automotive's negative cash flow position or sell the dealership, the Court is not convinced that Breedlove subjectively intended to injure the Bank at the time he failed to remit the proceeds to the Bank. Rather, the circumstantial evidence points to a pattern of Breedlove Automotive failing to remit proceeds to the Bank within three days, but later remedying the shortfall when future transactions were completed. The Bank admitted that Breedlove was "out of trust" in July 2002, but by August 2002, he had made all required payments on floor-planned vehicles sold in July. The Court believes that Breedlove intended to eventually pay for the floor-planned vehicles sold in August, but that intervening circumstances resulted in the loss of funding and closing of the dealership before the debt could be paid.

Courts in the Tenth Circuit have interpreted the "malicious injury" prong of Section 523(a)(6) as inflicting the injury "without just cause or excuse." Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek), 983 F.2d 1524, 1527-28 (10th Cir. 1993) ("evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite 'malice' in addition to 'willfulness' is present"), *overruled*

*in part by* <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 63 (1998); <u>Tinkler</u>, 311 B.R. at 880; <u>Talcott</u>, 29 B.R. at 879.

In <u>Davis</u>, the Supreme Court found that the debtor was justly excused from obtaining the lender's consent before selling a vehicle and from failing to immediately remit proceeds to the lender due to the prior course of dealing between the parties.  Similarly, in <u>Tinkler</u>, the bankruptcy court concluded that the debtor and lender had established a practice that was contrary to the floor plan agreement, creating ambiguity as to the rights and expectations of the lender with respect to timing of the debtor's obligation to remit proceeds, and therefore the lender failed to prove that the debtor intended to injure the lender when it merely continued the established practice.  <u>Tinkler</u>, 311 B.R. at 881-82.

In this case, the evidence established that the Bank did not strictly enforce the Three Day Payment Provision contained in the Floor Plan Agreement.  In fact, for a period of time after the February 9, 2001, the date the Floor Plan Agreement went into effect, the Bank advanced funds based on the total value of the used car inventory, not on a per vehicle basis, and therefore particular vehicle purchases and sales were not reported to or tracked by the Bank.  Sometime thereafter, the Bank began matching advances and payments to particular vehicles.  Finally, sometime in 2002, the Bank required Breedlove Automotive to surrender the titles to floor-planned vehicles to the Bank until the advance for the particular vehicle was repaid.  Because Breedlove Automotive was required to deliver the title to the purchaser within thirty days of the sale of a vehicle, Breedlove Automotive had an incentive to pay the Bank to release the title within thirty days.  As the Bank modified the procedure for obtaining

advances on the Floor Plan Line of Credit and accounting for sales of the floor-planned vehicles several times between the time the Floor Plan Agreement was executed and the date Breedlove Automotive ceased doing business, it was reasonable for Breedlove to believe that a violation of the Three Day Payment Provision was not inherently harmful to the Bank.

Based upon the historical course of Breedlove's dealing with the Bank, it was also reasonable for Breedlove to believe that Breedlove Automotive could delay payment on account of the sale of a floor-planned vehicle for up to thirty days after a vehicle was sold (*i.e.*, when the title would have to be delivered to the purchaser).  Unfortunately, during August 2002, Breedlove Automotive's financial fortunes deteriorated to the point that GMAC intervened, the Bank ceased advancing funds, and Breedlove Automotive could no longer survive.  Thus, this case is similar to the Davis and Tinkler cases, in that the course of dealing between the parties justified a belief that it could extend the float period between the time of the sale of a floor-planned vehicle and the repayment of the advance made on the vehicle without harming the Bank.

Circumstantial evidence supports that Breedlove intended to pay the Bank for the "out of trust" vehicles either with future profits or when he sold the dealership.  After GMAC descended on the dealership, the Bank ceased advancing funds, employees "walked out," and Breedlove Automotive could no longer pay its business expenses or debt service.  It was at that point that it appeared that unless the dealership could be sold, Breedlove Automotive would not be able to pay for the "out of trust" vehicles.  Notably, once it became apparent

that Breedlove Automotive could not continue as a going concern, Breedlove did not sell or otherwise compromise the Bank's collateral.[34]

Although the Bank contends that Breedlove used the proceeds of the "out of trust" vehicles to pay personal expenses and to purchase luxury goods, and that he eventually invested proceeds in the Bixby home, the Bank did not present sufficient evidence that Breedlove did any of these things.  The Bank's attempt to trace some of the proceeds to the purchase of the Bixby home was unpersuasive.  During August 2002, the period in which vehicles were sold "out of trust," it appears that the proceeds were applied to current business expenses, including debt service to the Bank.  Admittedly, these expenses included Breedlove's own salary, paid to Breedlove Management, but his salary was a legitimate and routine business expense.  In August 2002, Breedlove also authorized a net transfer of funds from Breedlove Nissan to Breedlove Automotive to defray some of Breedlove Automotive's business expenses.  Although the Court realizes that Breedlove and representatives of the Bank harbored mutual animosity against each other in month prior to the demise of Breedlove Automotive, the Court concludes that Breedlove did not intentionally or maliciously injure the Bank.

In its brief, the Bank relies heavily upon Bancfirst v. Padgett (In re Padgett), 105 B.R. 665 (Bankr. E.D. Okla. 1989).  Brief in Response to Defendant's Motion for Summary Judgment ("Bank's Brief"), at 21. In Padgett, the debtor was an automobile dealer who sold vehicles subject to a floor plan agreement with the plaintiff lender.  When the debtor

---

[34]According to the Bank's records, all "out of trust" vehicles were sold between August 8, 2002 and August 26, 2002.  "Out of Trust Vehicle List," Bank Exhibit 54.

experienced financial problems, he sought outside financing, not from established lenders but from shady "money finders."  When the financing did not materialize, the debtor liquidated his inventory, *i.e.*, sold inventory out of the ordinary course, concealed the sales, and did not pay the lender pursuant to the floor plan agreement.  Instead the debtor used the proceeds to make payments on other notes to the lender and for current operating expenses. The debtor did not use the proceeds for personal expenses or otherwise attempt to enrich himself with the lender's collateral.  The bankruptcy court concluded that the debtor's conduct resulted in a debt "for willful and malicious injury" to the lender's property.  At that time, the Tenth Circuit defined willful as "'conduct that is volitional and deliberate and over which the debtor exercises meaningful control, as opposed to unintentional or accidental conduct.'"  Id. at 667, *quoting* In re Posta, 866 F.2d 364, 367 (10th Cir. 1989).  In the bankruptcy court's opinion, the debtor's act of selling collateral and depositing proceeds in the dealership bank account instead of paying it directly to the lender constituted "willful" conduct.  The Posta definition of "willful" was specifically overruled by the United States Supreme Court in Kawaauhau v. Geiger, 523 U.S. 57 (1998), which held that Section 523(a)(6) excepted from discharge "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  Geiger, 523 U.S. at 61.  In any event, Padgett is not binding on this Court.[35]

_____

[35]The Court finds other pre-Geiger Section 523(a)(6) cases involving conversion of collateral cited by the Bank inapplicable.  The Bank also cites First Family Financial Services v. Burns (In re Burns), 276 B.R. 441 (Bankr. N.D. Miss. 2000), which is wholly unpersuasive because in that case the court granted summary judgment upon a stipulation by the debtor that he committed actual fraud and that the debt was excepted from discharge.

The Bank also cites various cases in support of the proposition that "[a] malicious injury is one in which the debtor either intended the resulting injury or intentionally took some action that was substantially certain to cause the injury."  Bank's Brief at 22-23, *quoting* <u>Tulsa Spine Hospital, LLC v. Tucker (In re Tucker)</u>, 346 B.R. 844, 853 (Bankr. E.D. Okla. 2006), and *citing* <u>Custom Heating & Air, Inc. v. Andress (In re Andress)</u>, 345 B.R. 358 (Bankr. N.D. Okla. 2006), *rev'd on other grounds*, No. 06-CV-414-TCK-PJC (N.D. Okla. May 9, 2007) (unpublished); <u>Bank of Commerce v. Hoyt (In re Hoyt)</u>, 277 B.R. 121 (Bankr. N.D. Okla. 2002).  The Court agrees that those cases recite the correct standard, but concludes that the Bank failed to establish that Breedlove intended to injure the Bank or believed it was substantially certain that the Bank would be injured.  Although Breedlove did not remit the proceeds according to the Three Day Provision, and ultimately, never made the payments needed to release the Bank's lien on the "out of trust" vehicles, the circumstantial evidence does not indicate that at the time the proceeds were applied to pay other expenses, Breedlove either intended to injure the Bank or believed that he would never be able to pay the Bank on account of the sale of the vehicles.  Thus, the Court cannot conclude that Breedlove subjectively believed that his failure to abide by the Three Day Provision was substantially certain to cause injury to the Bank.

## VI.    Conclusion

The Bank has failed to sustain its burden of proving that Breedlove's debt should be excepted from discharge.[36]  Accordingly, judgment shall be entered in favor of Breedlove and

---

[36]Because the Court concludes that the Bank failed to sustain its burden of proving the elements of Section 523(a)(2) and (a)(6), the Court need not address Breedlove's arguments

against the Bank.  Pursuant to Bankruptcy Rule 7054, Breedlove shall be entitled to recover

his costs.

       **SO ORDERED** this 9th day of July, 2007.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

---

challenging the formation or enforceability of the Floor Plan Agreement or Breedlove's
arguments for mitigating the amount of damages.